**In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.**

**PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE and the Official Committee of Equity Security Holders, Plaintiffs,**

and

**The State of New Hampshire, Plaintiff–Intervenor,**

v.

**Robert C. RICHARDS, Edward Kaufman and Martin Rochman, Defendants.**

**Bankruptcy No. 88–00043.**
**Adv. No. 92–1046.**

United States Bankruptcy Court,
D. New Hampshire.

Oct. 19, 1992.

filed. RIHT's Motion for Relief from the Automatic Stay was not filed until June 22.

John B. Nolan, Day, Berry & Howard, Hartford, CT, for PSNH Plaintiff.

Howard J. Berman, Whitman & Ransom, New York City, for the Official Committee of Equity Security Holders Plaintiff.

Mark Vaughn, Devine, Millimet & Branch, Manchester, NH, for the State of N.H.

Gerri Karonis, Manchester, NH, for the U.S. Trustee.

## AMENDED MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

### I. INTRODUCTION

The plaintiffs in this adversary proceeding seek declaratory and injunctive relief pursuant to 11 U.S.C. § 105(a) and 28 U.S.C. §§ 1651, 2201 and 2202 and Rule 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure. The plaintiff, Public Service Company of New Hampshire ("PSNH") is a reorganized debtor under a confirming order entered April 20, 1990. The plaintiff Committee of Equity Security Holders ("Committee") is one of the official committees that took part in the reorganization proceeding. The plaintiff, State of New Hampshire, was granted intervenor status by prior order in this adversary proceeding.

The plaintiffs seek to enjoin the defendants Robert C. Richards, Edward Kaufman and Martin Rochman (collectively "RKR" or the "RKR common stockholders") from filing a complaint in the U.S. District Court for the Southern District of New York, as they have threatened to do, alleging various violations of the Securities and Exchange Act of 1934 and other claims against various parties that participated in the solicitation process which lead to the confirmation of the plan of reorganization.

The defendants have not actually filed suit as yet but on March 6, 1992 by a letter from Robert C. Richards, one of the defendants and an attorney for all, sent a draft copy of the intended class action complaint to the attorneys for the plaintiffs with a short and succinct cover letter reading: "Dear Fellas: Here is a draft of a complaint that I intend to file in a month or so." Notwithstanding the somewhat flippant tone of the aforesaid cover letter the hearings before this Court have established that there is an actual and present dispute between the parties constituting a sufficient case and controversy that would support jurisdiction in a federal court.

In addition to the present plaintiffs in this adversary proceeding, the defendants' class action complaint names as additional

representative defendants and classes Northeast Utilities ("NU"), a major Connecticut Utility Company, that was a successful "bidder" in the plan auction procedures that lead to an acquisition and merger plan of reorganization of the debtor with Northeast Utilities, the State of New Hampshire, which was granted intervenor status in the reorganization proceedings, in view of the regulatory context involving the debtor public utility company, the members of the Equity Committee, the financial advisor to the Equity Committee, and the attorneys for Northeast Utilities and the Equity Committee. The plaintiff class in the proposed litigation is asserted as all persons who held common stock of PSNH on January 3, 1990 when this Court approved the disclosure statement with reference to the plan of reorganization that was ultimately confirmed.

The confirmed plan had an effective date tied to the obtaining of various regulatory approvals, including primarily the requirement under § 1129(a)(6) of the Bankruptcy Code requiring approval of the rates of a reorganized utility under a confirmed plan by the applicable regulatory agency. The New Hampshire Public Utilities Commission did approve the rate agreement embodied in the plan and the plan became effective on May 16, 1991. At this stage the debtor was reorganized pursuant to the plan and the confirmation order. The plan itself provided for a second contingent stage after reorganization to effectuate a merger of the reorganized debtor with Northeast Utilities after the Federal Energy Regulatory Commission ("FERC") and other involved regulatory agencies approved the proposed merger. At that stage NU through a subsidiary would purchase all of the newly issued and outstanding common stock of the reorganized PSNH at $20 per share. The FERC finally approved the merger on January 29, 1992, with various conditions which have been worked out acceptable to NU and the merger was actually implemented on June 5, 1992.

The gravamen of the proposed complaint [1] by the defendants here is to the effect that the solicitations for acceptances of the plan of reorganization by the defendants here during the reorganization proceedings involved false representations which should be actionable for damages under various theories and which are not protected by the "safe harbor" provisions of § 1125(e) of the Bankruptcy Code inasmuch as such false representations deny a "good faith" status to the plan proponents essential to the protection of § 1125(e) of the Code. The falsities alleged revolve around the following basic contentions: (1) That the disclosure statement misrepresented the powers of the NHPUC in acting upon appropriate rates for PSNH with regard to its Seabrook Nuclear Power Plant costs implying that the NHPUC had essentially unlimited discretion to set rates regardless of the impact on PSNH and its stockholders; (2) That the disclosure statement misrepresented the value that the common stockholders would receive if the merger were not implemented since the disclosure statement implied that the unsecured creditors would receive essentially the same value ($20 per share) even if the merger did not occur; and (3) The disclosure statement misrepresented the value of the merger to the ratepayers of PSNH and the stockholders and ratepayers of NU.

The plaintiffs in the present adversary proceeding seek a declaration from this Court that its findings in the confirmation order that the plan proponents "complied with the applicable provisions of chapter 11 of the Bankruptcy Code" and that the plan was proposed and solicited in "good faith" absolves any party involved in the solicitation of acceptance of the plan from liability for violation of any otherwise applicable law. Plaintiffs note that the confirmation order has now become final notwithstanding various appeals by the RKR parties. See *In re Public Service Company of New Hampshire,* 963 F.2d 469 (1st Cir.1992), *cert. denied sub nom., Rochman v. N.E.*

---

1. The proposed complaint is attached as an exhibit to the plaintiff's complaint in the present adversary proceeding.

*Utilities Service Co.,* — U.S. —, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992). Plaintiffs also note that RKR appeals in the NHPUC Regulatory proceeding that approved the rate agreement have also failed and that NHPUC approval is now final. See *Appeal of Richards, et al,* 134 N.H. 148, 590 A.2d 586, *cert. denied,* — U.S. —, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). Finally, plaintiffs note that the RKR parties had an opportunity to raise their present misrepresentation contentions not only at the disclosure statement stage and plan confirmation stage of the reorganization proceedings but also by a motion to revoke confirming order for fraud pursuant to § 1144 of the Bankruptcy Code.[2]

The present defendants respond that they are not attempting to revoke the confirming order but are simply seeking damages against the named defendants for plan solicitations not undertaken in good faith by those parties and that § 1125(e) of the Bankruptcy Code necessarily implies litigation outside the bankruptcy forum may ensue against plan proponents not acting in good faith. They further assert that there is no preclusive effect in that regard by the findings made in the confirming order; and that in any event this Court has no subject matter jurisdiction to consider enjoining their proposed lawsuit.

 With regard to the last point, concerning subject matter jurisdiction, I ruled from the bench at the conclusion of the hearings in this matter that this Court does in fact have jurisdiction to enforce its own orders when that relief is warranted. *Local Loan Co. v. Hunt,* 292 U.S. 234, 239, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934); *In re Franklin,* 802 F.2d 324, 326 (9th Cir.1986); *Lee v. Hunt,* 631 F.2d 1171 (5th Cir.1980), *cert. denied,* 454 U.S. 834, 102 S.Ct. 133, 70 L.Ed.2d 112 (1981); *In re Paris Indus. Corp.,* 132 B.R. 504, 508 (D.Me.1991); *In re Johns Manville Corp.,* 91 B.R. 225, 228 (Bankr.S.D.N.Y.1988); *In re White Motor Credit Corp.,* 75 B.R. 944, 947 (Bankr.N.D. Ohio 1987); *In re Coral Air, Inc.,* 40 B.R.

979, 982 (D.V.I.1984). That jurisdiction includes the power to declare and determine the scope and effect of orders entered in the bankruptcy proceeding in certain circumstances. The pertinent orders involved were the orders entered during the reorganization of PSNH approving the disclosure statement as containing "adequate information" for those called upon to vote upon the plan pursuant to § 1125 of the Bankruptcy Code, and the Order Confirming the Plan of Reorganization under § 1129 of the Code which contained determinations, *inter alia,* that the proponent of the plan complied with all applicable provisions of the Bankruptcy Code and that the plan had been proposed in good faith and not by any means forbidden by law. Interrelated is the impact of § 1144 of the Code regarding a remedy for fraud and the procurement of a confirming order as it may throw light upon the proper construction of the other statutory provisions. In this context it is my judgment that this adversary proceeding clearly arises under Title 11 and arises in a case under Title 11, United States Code, and therefore comes within the subject matter jurisdiction provided under 28 U.S.C. § 1334(b), and moreover constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). *Local Loan Company v. Hunt,* 292 U.S. at 239, 54 S.Ct. at 697; *In re Paris Industries,* 132 B.R. at 508. Whether that jurisdiction should be used here to grant the relief requested is another question.

Accordingly, I adhere to the reasons and ruling that I made from the bench with regard to this matter and hold that this Court does have subject matter jurisdiction and jurisdiction over the parties to determine the questions presented in this adversary proceeding.

The parties have submitted the questions raised in this adversary proceeding for determination by cross motions for summary judgment as to which oral arguments were heard on July 10, 1992. The Court has reviewed the extensive pleadings and docu-

---

2. The RKR parties did in fact file a motion to revoke the confirming order under § 1144 but that motion was dismissed as untimely inasmuch as it was filed after the mandatory 180 day provision of § 1144 of the Code. (Court Document No. —).

mentations submitted by the parties together with its own review of the record of the reorganization proceeding and finds that the matter is appropriate for summary judgment disposition under the applicable standards.[3]

## II. KEY FACTS

1. On January 28, 1988, Public Service Company of New Hampshire ("PSNH"), as debtor, commenced a voluntary reorganization case under Chapter 11 of the Bankruptcy Code. (Docket No. 1).[4]

2. The Third Amended Joint Plan of Reorganization ("Plan") (Docket No. 2997) proposed by Northeast Utilities Service Corporation ("NUSCO"), PSNH, the Official Committee of Unsecured Creditors ("Creditors Committee"), the Equity Committee, Citicorp, Consolidated Utilities & Communications, Inc. and Shearson Lehman Hutton Inc. and the Third Amended Disclosure Statement ("Disclosure Statement") (Docket No. 2998) were filed on December 28, 1989. This Plan of Reorganization was the "surviving plan" from a competitive bidding process between four major regional utilities interested in acquiring PSNH that took place during a series of disclosure statement hearings on multiple plans which occurred from September of 1989 in accordance with specific procedures authorized and directed by the Court for that purpose.

3. On December 20, 1989, defendants Martin Rochman and Robert Richards filed a motion to reopen the hearings with respect to the Disclosure Statement, summarily reject the Plan, create a common stockholder committee and to require PSNH to seek regulatory approval for a rate increase. In addition to seeking an order directing PSNH to file a rate case,

Rochman and Richards also requested that the court enjoin the New Hampshire Public Utilities Commission ("NHPUC") from suspending that filing so that it could go into effect without suspension and not subject to refund. (Docket No. 2969). The motion was denied. (Docket No. 2979 and 2979.1).

4. On December 28, 1989, this court conducted a final hearing on the Disclosure Statement. (Docket No. 3014). By Order dated January 3, 1990 (Docket No. 3003), this court approved the Disclosure Statement, having previously held that the [Proposed] Second Amended Disclosure Statement filed by NUSCO on December 6, 1989 had "contained adequate information within the meaning of § 1125 of the Bankruptcy Code."[5] No appeal was taken from the Order approving the Disclosure Statement.

5. On January 10, 1990, Rochman and Richards refiled their earlier motion to reject the Plan summarily (Docket No. 3025). The motion was denied by Order entered February 9, 1990, (Docket No. 3111) and no appeal was taken.

6. On January 16, 1990, Rochman and Richards filed Application of Martin Rochman and Robert C. Richards For An Order Amending The Disclosure Statement For the Northeast Utilities Service Company Plan Of Reorganization (Docket No. 3047). The application was denied by Order entered January 17, 1990 and no appeal was taken. (Docket No. 3052).

7. Rochman and Richards also filed an *ex parte* application dated January 16, 1990 (Docket No. 3046) seeking to restrain temporarily transmission of the Disclosure Statement to stockholders. This court denied the application on January 17, 1990 (Docket No. 3052). No appeal was taken.

---

**3.** "Summary judgment is proper where there is no 'genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *Bank One Texas v. A.J. Warehouse, Inc., et al,* 968 F.2d 94 (1st Cir.1992).

**4.** Unless otherwise noted, all references to docket numbers are to the PSNH Bankruptcy Case, No. 88–00043.

**5.** The Court had previously closed the disclosure statement hearings at the conclusion of an extensive all-day Saturday hearing on December 2, 1989, subject to awaiting the action of the Legislature of the State of New Hampshire scheduled to meet in special session in mid-December to consider enactment of the necessary enabling legislation with regard to the rate agreement embodied in the plan. (Transcript, Document No. 2947)

8. On February 23, 1990, Messrs. Richards, Kaufman, and Rochman ("RKR") filed objections to Confirmation of the Plan. (Docket No. 3173).

9. On March 16, 1990, RKR filed a supplement to their prior objections to Confirmation of the Plan (Docket No. 3372).

10. On April 20, 1990, after six days of hearings, this court confirmed the Plan and found that the Plan was proposed in "good faith and not by any means forbidden by law." Confirmation Order, p. 3, ¶ 4. (Docket No. 3617). This court considered the objections filed by RKR and rejected them, ruling that "the rate increase results under the Rate Agreement represents a fair and equitable settlement and compromise well within the range of results reasonably expectable in a litigated rate case." Confirmation Order, p. 12, ¶ 28. In connection with the Confirmation Order, this court also issued its General Findings of Fact and Conclusions of Law Re Plan Confirmation Issues (the "General Findings and Conclusions"). (Docket No. 3618). Paragraph 47 of the General Findings and Conclusions provided that the Proponents have engaged in post-petition disclosure and solicitation in good faith and in compliance with the applicable provisions of Section 1125 [of the Bankruptcy Code]. In addition, this court issued a separate opinion dated May 17, 1990, providing amplified findings and conclusions dealing solely with the RKR objections (the "RKR" Opinion) (Docket No. 3742). *In re PSNH*, 114 B.R. 820 (Bankr.D.N.H.1990).

11. On May 21, 1990, following the issuance of the RKR Opinion, RKR appealed the Confirmation Order to the United States District Court for the District of New Hampshire, and filed a motion for stay of the Confirmation Order in this court (Docket No. 3794). After a hearing held on June 8, 1990, this court denied that motion by Memorandum Opinion and Order on Motion for Stay Pending Appeal dated June 19, 1990. *In re PSNH*, 116 B.R. 347.

12. On May 30, 1991 NUSCO et al filed a motion to dismiss the RKR appeal and the district court refused the motion because NUSCO had failed to certify a good faith attempt to obtain RKR's concurrence under Rule 11 of the Local District Court Rules. On June 10, 1991, RKR's concurrence was denied. NUSCO then certified this to the district court. RKR subsequently filed a Motion for Declaration That Appeal Will Not Be Mooted By Substantial Consummation of Plan of Reorganization, or In The Alternative For a Stay of Confirmation Order Pending Appeal in the district court. That motion was refused by the Clerk of the district court on July 26, 1990, because of RKR's failure to comply with Rule 11 of the local district court rules. RKR never refiled their motion.

13. On February 6, 1991, RKR again sought a stay of the implementation of the Plan by filing a Motion for a Stay of Confirmation Order Pending Appeal in the district court.

14. On January 17, 1991, RKR filed a Request for Revocation of Confirmation Order with this court (Docket No. 5138) claiming that the Confirmation order had been procured by fraud. RKR contended in their request that various proponents of the Plan has misrepresented in the Disclosure Statement the true value of the merger. By Order dated February 20, 1991, (Docket No. 5330), this court dismissed RKR's request on the ground that it was time-barred by 11 U.S.C. § 1144. RKR never appealed the order.

15. On August 6, 1991, RKR filed a petition for a writ of mandamus from the United States Court of Appeals for the First Circuit ordering Chief Judge Shane Devine to decide the RKR appeal of the Confirmation Order on the merits within sixty days. On August 21, 1991 and August 22, 1991, the District Court issued a Memorandum Opinion and entered Judgment affirming this court's order confirming the Plan. *In re Public Serv. Co.*, No. 90-272-D, slip. op. (D.N.H. Aug. 21, 1991). NUSCO et al filed a "suggestion of mootness" with regard to the RKR petition for the writ of mandamus because the August 21, 1991 district court memorandum opinion affirming the Confirmation Order mooted the petition for a writ of mandamus.

16. On September 13, 1991, RKR filed an appeal of that judgment with the United States Court of Appeals for the First Circuit, claiming that this court erred in concluding that the Rate Agreement was fair and equitable and a reasonable compromise.

17. On February 4, 1992, the First Circuit heard oral argument on the RKR appeal and dismissed the appeal in an extensive opinion entered on May 6, 1992. *In re Public Service Company of New Hampshire*, 963 F.2d 469 (1st Cir.1992). On May 18, 1992 RKR petitioned the First Circuit for a rehearing of the order dismissing the RKR appeal. The First Circuit denied the rehearing on May 27, 1992. On June 29, 1992, RKR filed a petition for a. writ of certiorari with the United States Supreme Court. Certiorari was denied by order of the Supreme Court entered in October 1992. *Rochman v. N.E. Utilities Service Co.*, — U.S. —, 113 S.Ct. 304, 121 L.Ed.2d 226 (1992).

18. While RKR pursued their appeals from the Confirmation Order, and sought revocation of the Confirmation Order in this court, they also launched, unsuccessfully, collateral attacks on the Plan in other fora. RKR sought to intervene in regulatory proceedings brought by PSNH and NUSCO at the New Hampshire Public Utilities Commission ("NHPUC") and the Federal Energy Regulatory Commission ("FERC"). Each of RKR's applications to intervene in the regulatory proceedings was denied.

19. On May 16, 1990, after their motion to intervene in the NHPUC proceeding was denied, RKR took the unusual step of filing a petition for Writ of Prohibition in the New Hampshire Supreme Court seeking to enjoin proceedings at the NHPUC on the Rate Agreement. (Copy attached as Exhibit 19). That extraordinary Writ was denied by the New Hampshire Supreme Court on June 18, 1990.

20. On July 20, 1990, the NHPUC issued its order approving the Rate Agreement. RKR then filed an Application for Rehearing of Order Approving Rate Agreement, which was denied by the NHPUC on August 17, 1990. RKR appealed the NHPUC order to the New Hampshire Supreme Court. In their briefs to the New Hampshire Supreme Court, RKR claimed that the Disclosure Statement was misleading with respect to the value of the Plan to common shareholders and argued that the property of PSNH was taken in violation of the United States Constitution.

21. On April 24, 1991, the New Hampshire Supreme Court dismissed RKR's appeal for lack of standing. *Appeal of Richards*, 134 N.H. 148, 590 A.2d 586 (1991), *cert. denied*, — U.S. —, 112 S.Ct. 275, 116 L.Ed.2d 227 (1991). The Court also affirmed the NHPUC's decision that the Rate Agreement was in the "public good" and that the rates were " 'just and reasonable.' " *Id.*, 590 A.2d at 595–97. In their petition for a writ of certiorari filed with the United States Supreme Court, RKR asserted many of the same claims they had advanced in previous challenges to the Plan, including that the Plan misrepresented the value of the Plan to the common stockholders if there were no merger. The petition was denied.

22. On March 6, 1992, under a cover letter addressed to the attorneys for NUSCO and the equity security holders' committee, RKR advised that they "intended" to file a complaint against the State of New Hampshire, NU, NUSCO, all members of the Official Committee of Equity Security Holders except Rochman, as well as certain attorneys and advisors to those entities.

23. NU, NUSCO and the Equity Committee responded by the present adversary complaint filed on April 1, 1992 seeking declaratory and injunctive relief against the intended lawsuit.

24. On April 6, 1992, the State of New Hampshire, a sovereign state of the United States, moved for and was granted intervention as a party plaintiff.

25. Defendants Richards and Kaufman are citizens of New York while defendant Rochman is a citizen of Massachusetts.

26. On April 6, 1992, this Court conducted a hearing on the plaintiffs' motion for a

preliminary injunction preventing RKR from filing the threatened suit.

27. As a result of the April 6, 1992 hearing, the parties entered into a consented to temporary restraining order reserving their respective rights and tolling any statutes of limitations that might bear on the suit until this Court acted on the underlying complaint for a permanent injunction.

28. On April 29, 1992 the plaintiffs filed a motion for summary judgment permanently enjoining RKR from filing the threatened suit.

29. On May 4, 1992 the State of New Hampshire filed a motion for summary judgment requesting a determination that the Eleventh Amendment to the Constitution of the United States would prevent the defendants from bringing suit against the State of New Hampshire and alternatively that the claims threatened by the defendants had been or could have been litigated previously and had been barred by res judicata.

30. On May 27, 1992 RKR cross-motioned for summary judgment on plaintiffs' complaint and/or dismissal pursuant to Fed.R.Civ.P. 12(b)(1) and (6).

31. On July 10, 1992 the Court conducted a full hearing on the cross-motions for summary judgment and took as the matter under submission the request for declaratory and permanent injunctive relief.

### III. STATUTES INVOLVED

The pertinent provisions of the Bankruptcy Code bearing upon decision in this matter are as follows:

11 U.S.C. § 1125(b)

*§ 1125. Postpetition disclosure and solicitation.*

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court

as continuing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

\* \* \* \* \* \*

11 U.S.C. § 1125(e)

A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of securities.

\* \* \* \* \* \*

11 U.S.C. § 1129(a)(1)–(3)

*§ 1129. Confirmation of plan.*

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

\* \* \* \* \* \*

11 U.S.C. § 1144

*§ 1144. Revocation of an order of confirmation.*

On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall—

(1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and

(2) revoke the discharge of the debtor.

## IV. PRECLUSION IN GENERAL

RKR argues that neither principles of res judicata nor collateral estoppel provide a valid basis on which to enjoin their threatened suit. RKR's basic contention here is that the dismissal of an appeal of a confirmation order for mootness "erases" the preclusive effect of the confirmation order's findings and rulings. RKR's memorandum of law states the argument as follows:

> With regard to the first allegation, this Court determined that the Rate Agreement was a reasonable compromise because the NHPUC had the power to set rates that the Disclosure Statement represented that it had. But we appealed the Confirmation Order on the grounds that that determination was erroneous. The District Court upheld the Confirmation Order on the merits but the First Circuit dismissed the appeal as moot. As a result this Court's determination with regard to the rules applicable to a rate case has been erased and principles of neither *res judicata* nor *collateral estoppel* (sic) prevent us from litigating that issue in another action. We simply have not had a full opportunity to litigate the merits of the issue and therefore are not barred by principles of *res judicata* or *collateral estoppel* from litigating it fully in another action.

Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment at 14.

RKR finds support for this proposition from the Restatement (Second) of Judgments. The Restatement states:

> Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:

> (1) The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action.

Restatement (Second) of Judgments § 28.

RKR's reliance on the Restatement is misplaced because RKR could have obtained review of the confirmation order and was not barred in doing so by any law. The plaintiffs' have noted this fact arguing that RKR failed to timely appeal or otherwise pursue the denial of stay of the confirmation order and such failure allowed the plan to progress to the point of substantial consummation. RKR's response is that to "reverse" the confirmation order would have required a stay "and to get a stay we [RKR] would have had to put up a bond of a few hundred million, if not a billion or more, dollars." Memorandum of Law in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment at 16. Whether true or not, this assertion is immaterial in the context of this case. *See In re PSNH*, 116 B.R. 347 (Bankr.D.N.H. 1990). To rule otherwise would in effect nullify the specific stay procedures, and well-established caselaw regarding mootness on appeals in the absence of a stay of a plan confirmation order, designed to effectuate a strong legislative policy to insure finality with regard to reorganization of plans under the Bankruptcy Code. Bankruptcy Rule 8005; *see, e.g., In re Public Service Company of New Hampshire*, 963 F.2d 469 (1st Cir.1992); *In re Roberts Farms*, 652 F.2d 793 (9th Cir.1981); *cf. In re Stadium Management Corp.*, 895 F.2d 845, 848 (1st Cir.1990) (citing with approval *Roberts Farms* in holding that where objectors to sale of debtor's assets failed to obtain a stay pending appeal, their objection to completed sale was moot.).

In fact, the Supreme Court decision of *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), is controlling on this kind of situation and supports the plaintiffs. *Munsingwear* began by reciting the doctrine of res judicata:

[res judicata applies when] a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; *and even if the second suit is for a different cause of action, the right, question or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified.*

*Munsingwear,* 340 U.S. at 38, 71 S.Ct. at 105–06 (quoting *Southern Pacific R. Co. v. United States,* 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)) (emphasis added).

The appellant in *Munsingwear* also cited the Restatement (First) of Judgments in urging the Court to create an exception where their appeal was dismissed for mootness.[6] Noting that the appellant had failed to file a motion to vacate the judgment in that case and then acquiesced in its dismissal, the Supreme Court wrote "[i]f there is hardship in this case, it was preventable ... the United States having slept on its rights, now asks us to do what by orderly procedure it could have done for itself. The case illustrates not the hardship of *res judicata* but the need for it in providing terminal points for litigation." *Id.,* 340 U.S. at 41, 71 S.Ct. at 107.[7]

The tortured appellate procedure of *Miami Center Ltd. Partnership v. Bank of New York,* 838 F.2d 1547, 1557 (11th Cir. 1988), is not unlike the present case. One of two appeals in *Miami Center* was of the district court's affirmance of the bankruptcy court's order confirming a creditor's plan of reorganization. The debtors moved for a stay of the confirmation order pending appeal. The bankruptcy court granted

a stay on the condition that the debtors post a bond in the amount of $140 million dollars which was subsequently adjusted downward to $50 million dollars. The debtors appealed the bond ruling which the district court dismissed for lack of jurisdiction. Thereafter, the debtors failed to post the bond and the plan proponents went about implementing the plan.

The appeal of the confirmation order was opposed by the plan proponents who moved to dismiss the appeal as moot because no stay had been obtained. After remand and appeal, the eleventh circuit held "that the court [district court] should have dismissed the appeal as moot when the case came back to it after remand." *Miami Center,* 838 F.2d at 1553.

Significant for purposes of RKR's contention that this court's confirmation order is not entitled to preclusive effect because RKR's appeal was dismissed as moot is the following excerpt of the eleventh circuit's decision:

Had the appeal to the district court on the consolidation and confirmation orders been dismissed as moot, as it should have been, the judgment of the bankruptcy court in that appeal would have become final. The issues adjudicated by this judgment would then have been precluded from reexamination by Judge Hoeveler in his consideration of whether to dismiss the fraud/RICO case. These same consequences will ensue now upon the entry of an order by Judge Aronovitz dismissing the appeal from the bankruptcy court as moot.

*Miami Center,* 838 F.2d at 1557.

■ Although RKR's arguments about the practical impossibility of posting the appeal bond are understandable, the fact remains this obstacle was not a legal im-

**6.** "Where a party to a judgment cannot obtain the decision of an appellate court because the matter determined against him is immaterial or moot, the judgment is not conclusive against him in a subsequent action on a different cause of action."

Restatement (First) of Judgments § 69(2).

**7.** The "orderly procedure" referred to by the Supreme Court by which an appellant may pre-serve its rights to relitigate a right of action heading for dismissal on mootness grounds is to request a reversal or vacatur of the judgment below and an order remanding the case with an instruction to dismiss it. In this way, the appellant does not find itself in front of the judicial bar of res judicata. *Munsingwear,* 340 U.S. at 39, 71 S.Ct. at 106.

pediment but a practical matter. Stopping a $2.3 billion reorganization involving many parties and complex financial arrangements is no exercise in theory but a very substantial undertaking. The central fact is that RKR never obtained a stay of the confirmation order, regardless of whatever happened thereafter. On these facts, I hold that the dismissal of the RKR appeal of the confirmation order on the ground of mootness does not eviscerate the preclusive effect of that order.

## V. RELEVANT CONTEXT

The fact that this Court does not accept RKR's contention that the dismissal of their appeal in the Court of appeals removed any preclusive effect of the findings and determinations made by this Court in its confirming order and its accompanying opinions does not by itself mean that the preclusive effect of those findings necessarily would prohibit the threatened law suit.

An essential predicate to determining the preclusive effect that may be given to the findings and determinations made in this case, in the reorganization proceedings, prior to and in the ultimate confirmation determination, as they may apply to the now threatened litigation, requires some understanding of the context in which this unique organization of a regulated public utility company took place. In this context the Court can and does take judicial notice of the pertinent portions of the record of this chapter 11 case.

As the record establishes, the reorganization was essentially accomplished through an "auction process" in which four substantial regional electric utility companies negotiated and "bid" in ever higher increments and improvements to their respective plans of reorganization during the course of the disclosure statement hearings commencing under orders entered in August of 1989 and concluding with the final approved disclosure statement, with the one successful plan coming out of that bidding process, by an order approving the disclosure statement entered January 3, 1990 as discussed above.[8]

Without belaboring the matter with extensive detail it is apparent from the record in the disclosure statement hearings that essentially all of the questions and topics now posed by the RKR stockholders justifying their threatened litigation were in fact discussed and bruited about endlessly during the course of the hearings that resulted in the ultimate plan and disclosure statement approved by the Court. Accordingly, there is little room to contend that the matters now complained of as being misrepresentations concerned subjects which were not known to the Court or the parties in the plan reorganization process.

The question as to the breadth and scope of disclosure which would provide "adequate information" pursuant to § 1125 of the Bankruptcy Code was a question of judgment and discretion that this Court exercised in the context of the foregoing development of the proposed plan of reor-

---

**8.** The orders of this Court which established that bidding process to maximize the values obtainable in the reorganization from competitive bidding were entered commencing in March of 1989 and ending with the aforesaid order approving the disclosure statement with regard to the single joint plan that successfully survived that process. The orders involve appear in the record as Court Documents No. 1896, entered March 16, 1989; No. 1899, entered March 16, 1989; No. 2155A, entered May 12, 1989; No. 2386, entered August 14, 1989; No. 2400, entered August 18, 1989; No. 2687, entered October 16, 1989; No. 2836, entered November 7, 1989; No. 2897, entered November 27, 1989; No. 2943, entered December 8, 1989; No. 2944, entered December 8, 1989; No. 2945, entered December 8, 1989; No. 2979, entered December 22, 1989; No. 3003, entered January 3, 1990; No. 3001, entered January 3, 1990. Transcripts of the various hearings held to determine the multiple plan procedures and the related hearings that evolved the various disclosure statements and plans are also relevant in this regard to indicate the bidding process that took place. See Court Document No. 2391, August 11, 1989; No. 2428, August 18, 1989; No. 2527, September 22, 1989; No. 2693, October 13, 1989; No. 2798, October 27, 1989; No. 2887, November 13, 1989; No. 2898, November 14, 1989; No. 2961, November 15, 1989; No. 2971, November 16, 1989; No. 2972, November 17, 1989; Nos. 2887, 2888, November 20, 1989; No. 2920, November 30, 1989; No. 2922, December 1, 1989; No. 2947, December 2, 1989; and No. 3014, December 28, 1989.

ganization and the various hearings leading to a determination of what would be adequate information for creditors and stockholders called upon to vote upon the plan.

Indeed, when the RKR individuals became active in the case in late December of 1989, and filed their flurry of pleadings objecting to the Disclosure Statement and requesting various actions to undo the plan formulation process that had already occurred, this Court and the parties in interest clearly were on notice of their contentions, but nevertheless their requests were denied and those determinations have now become final in terms of what would constitute adequate disclosure with regard to the plan of reorganization that was ultimately confirmed.

The final disclosure statement (Court Document No. 3062) in its index, page iii, gave clear notice to all concerned that the rate agreement was a major factor in the proposed plan by the following detailed listing of specific topics pertaining to that subject:

A. General Rules Applicable to a Seabrook Rate Case

B. Major Issues Presented by Seabrook in Rate Case

 1. Prudence

 2. Used and Useful

 3. Affordability of Rates

C. Conduct of a Rate Case

D. Possible Outcome of a Seabrook Rate Case

 1. Possibility of Full Recovery

 2. Prudence of Seabrook Investment

 3. Used and Useful Nature of Seabrook

 4. Affordable Rate Levels

 5. Recent Seabrook Settlements

 6. Comparative Advantages of Proposed Rate Plans and a Seabrook Rate Case

The referenced portion of the Disclosure Statement appears on pp. 70–74 of that document.

With particular reference to the uncertainties with regard to the setting of utility rates, in this context, the disclosure statement (Court Document No. 3062, pp. 70–71) noted the following:

As a regulated utility, PSNH has certain rights and responsibilities. It is obligated to provide safe and reliable service on a non-discriminatory basis to all who request service. It must also conform to regulations with respect to the provision of its services to the public and limit its charges to the rates approved by regulatory agencies, most importantly the NHPUC. On the other hand, PSNH and its investors are entitled under state and federal law to just and reasonable treatment, including a fair opportunity to earn a reasonable return on capital invested to serve the public. Regulatory agencies are not required to follow any specific regulatory approach, but the end result of regulation must be fair to investors as well as consumers. And, while regulatory agencies are afforded a great deal of discretion, policies or practices that are clearly unreasonable and result in significant financial harm to a utility or its investors have been held to violate the due process protections of the United States Constitution.

Traditional ratemaking and current New Hampshire law would permit the NHPUC to determine whether to allow inclusion in rates of all or part of PSNH's investment in Seabrook, once Seabrook begins "actually provid[ing] service to consumers." N.H.Rev.Stat. Ann. § 378:30–a (the anti-CWIP law). PSNH contends that this investment will be approximately $2.9 billion at January 1, 1990, including $1.6 billion in carrying costs.

The fixed rate increases provided in the Rate Plan are lower than the rates which PSNH contends it would be entitled to collect under traditional ratemaking principles, once Seabrook is providing service to consumers and rate changes are authorized by the NHPUC. In effect, implementation of the Plan will result in recovery of $1.4 billion, or approximately 50%, of the Seabrook investment.

While the disclosure statement does indicate that the NHPUC would have flexibili-

ty in setting rates that representation in context does not take away from the fact that the Disclosure Statement treatment as a whole refers to the unique context of this debtor embroiled in a bankruptcy reorganization proceeding, the New Hampshire enabling legislation for the rate agreement, and the various other uncertainties involved.

Essentially all of the issues now being raised by the RKR individual stockholders were in fact discussed at least in general terms in this Court's opinion supporting confirmation of the plan of reorganization:

> The credible evidence, however, supports a finding that PSNH could not recover substantially more under a traditional rate case than it would under the Plan because it is unlikely PSNH would recover significantly higher rates under a rate case. Even if PSNH were successful in obtaining higher rates, the impact of such rate hikes would likely lead to a loss of customers and loss of net revenue to PSNH, and ultimately to a lower return than that proposed under the Plan.

> \* \* \* \* \* \*

> The significant publicity surrounding this bankruptcy has assured that any interested potential bidder was informed about this case. Interested bidders had many opportunities to negotiate with the Committees, the Debtor, and the State under the special procedures adopted by the Court for this unique case. The unusual problem of "valuation circularity" presented by a chapter 11 reorganization of a regulated monopoly utility company, and the special procedures employed in this reorganization case to deal with that unique problem, have been discussed at some length in prior opinions of this Court. See, e.g., In re PSNH, 88 B.R. 521 (Bankr.D.N.H.1988); In re PSNH, 88 B.R. 546 (Bankr.D.N.H.1988); In re PSNH, 99 B.R. 155 (Bankr.D.N.H.1989); In re PSNH, 99 B.R. 177 (Bankr.D.N.H.1989); In re PSNH, 108 B.R. 854 (Bankr.D.N.H.1989).

> \* \* \* \* \* \*

> The plan that ultimately succeeded in attracting the support of the Committees was the plan that offered the most value for the Debtor. A Commission of the Federal Energy Regulatory Commission has stated that this auction assured that maximum value was paid for the Debtor. Therefore, the Court finds that the liquidation value of the Debtor is no more than what has been offered for the Debtor in this Proposed Plan.

> \* \* \* \* \* \*

> The Court itself during the disclosure statement hearings and proceedings insisted this alternative be set out for the consideration of creditors and stockholders before they were called to vote upon the Plan. The objections to the confirmation filed by common stockholders Rochman, Kaufman and Richards ("RKR") generally raise this issue in the sense that they question the appropriateness of the Rate Agreement and compromise embodied in the Plan and argue that more value could be realized for shareholders if the Plan is denied confirmation and either the debtor-in-possession or its successors were authorized to pursue a litigated rate case before the NHPUC. This contention is considered and rejected in the confirming order entered separately this date.

> \* \* \* \* \* \*

> With regard to the prudent investment recovery point, the objectors see this principle as a fixed star governing what the regulatory agency can do with regard to the recovery of costs associated with the Seabrook nuclear power plant, and argue further that the requirement is of constitutional dimension. The Supreme Court of the United States however has expressly declined to adopt prudent investment recovery as a constitutional standard. Duquesne Light Co. v. Barasch [488 U.S. 299, 313–17], 109 S.Ct. 609, 619–20 [102 L.Ed.2d 646] (1989). The caution which all courts have exhibited in avoiding an exclusive focus on prudent investment as a cost recovery standard stems from the desire to avoid an unwarranted incentive for over capacity

generation by public utilities. See *Pierce*, "The Regulatory Treatment of Mistakes in Retrospect: Cancelled Plants and Excess Capacity", 132 U. of Pa. Law Review 497 (1984).

\*　\*　\*　\*　\*　\*

New Hampshire itself, in its statutory and regulatory framework, has both the "prudent" and a "used and useful" standard in this regard, undergirded by the ultimate "just and reasonable rates" statutory language provided in NH RSA 378:7. This legal framework for regulatory action is a far cry from the simplistic "prudence only" position put forward by the objectors. It obviously implies a balancing to cover both the initial analysis at the beginning of the plant construction as well as the ultimate effect of the plant coming on line at a particular time and at a particular cost.

\*　\*　\*　\*　\*　\*

The New Hampshire PUC and the New Hampshire Supreme Court gave ample warnings to PSNH in this regard in various rulings issued during the course of the Seabrook plant financing and construction. See, e.g., *Petition of Public Service Co. of New Hampshire*, 130 N.H. 265 [539 A.2d 263] ("N.H.1988"); *Appeal of Public Service Co. of New Hampshire*, 130 N.H. 748 [547 A.2d 269] (N.H.1988); *Re Public Service Co. of New Hampshire*, 70 N.H.P.U.C. 886, 904 (1985); *Re Public Service Co. of New Hampshire*, 68 N.H.P.U.C. 668, 670 (1983); *Re Public Service Co. of New Hampshire*, 67 N.H.P.U.C. 223, 231–2 (1982); *Re Public Service Co. of New Hampshire*, 67 N.H.P.U.C. 490, 525 (1982); *Re Public Service Co. of New Hampshire*, 65 N.H.P.U.C. 492, 493 (1980).

\*　\*　\*　\*　\*　\*

The Supreme Court of the United States has indicated in dicta that a "shift in methodologies" by a state regulatory agency in midstream with regard to the construction of a regulated utility plant might present a question of constitutional due process violation as a "taking" if shown. See *Duquesne Light Co. v. Barasch* [488 U.S. 299, 313], 109 S.Ct. 609, 619 [102 L.Ed.2d 646] (1989) ("The risks a utility faces are in large part defined by the rate methodology because utilities are virtually always public monopolies dealing in an essential service, and so relatively immune to the usual market risks. Consequently, a State's decision to arbitrarily switch back and forth between methodologies in a way which required investors to bear the risk of bad investments at some time while denying them the benefit of good investments at others would raise serious constitutional questions."). In the present case the court inquired as to whether the objectors could show any such shift in ratemaking methodologies on the part of the New Hampshire [sic] which might present a basis for constitutionally-required full recovery of Seabrook costs but in my judgment the objectors were unable to point to any such shift.

\*　\*　\*　\*　\*　\*

The concepts of "prudency" and "used and useful" according to the record before me, and the applicable case law, are evolving concepts that regulators are using to effectuate an appropriate balance in the sharing of costs associated with excess cost power plants between ratepayers and investors. In other words, it is at least arguable, notwithstanding the best management and control of costs in the actual construction of a plant, that the decision to go forward with the construction and completion of the plant may be deemed imprudent if it will result in a power plant coming on line with electricity too expensive to be used at the high rates necessitated by full recovery of the associated construction costs. Cf. *In re Western Massachusetts Electric Co.*, 80 PUR 4th 479, 542 (Mass.D.P.U. 1986). The same broadened meaning of the "used and useful" concept could also arguably [sic] can be applied to effectuate a sharing of costs of such a plant, as indicated in the New Hampshire decisions cited above. The very concept of excess capacity *created by a plant too expensive for customers to use* is a phe-

nomenon largely attributable to the experience in recent years of massive cost overruns with regard to nuclear power plants.

The phenomenon was recognized however in other contexts as early as 1949 by the New Hampshire Supreme Court as noted in *In re New England Telephone & Telegraph Co. v. State*, 95 N.H. 353, 360 [64 A.2d 9] (1949), "If as the report of the Commission implies, construction undertaken by the [c]ompany is 'wasteful' *or its expense is unwarranted by the demand probable at the necessary price for service produced by it, ...* unwarranted investments may be excluded from rate base, and unjustified expenditures from the determination of a reasonable return." (Emphasis added).

*See In re PSNH*, 114 B.R. 820, 823–25, 839, 841, 842 n. 11.

The RKR stockholders appealed the confirmation of the plan as indicated above to the United States District Court. That Court in its decision affirming the confirming order entered August 21, 1991, *In re Public Service Co.*, No. 90–272–D (D.N.H. filed Aug. 21, 1991) dealt with a number of the arguments put forward by the appellants as follows:

A number of witnesses testified with respect to the "auction" of PSNH. Robert M. Spann, senior consultant for Charles River Associates, lecturer in economics at George Washington University, and a specialist in regulatory economics and finance, testified that if the value of PSNH was greater than that offered by NUSCO, some other entity would have made such offer. T. III, 115–23.

\* \* \* \* \* \*

John F. Curley, managing director of the Merchant Banking Department of Morgan Stanley, was retained to advise NUSCO on the possibility of purchasing PSNH. T. III, 196–97. He testified that the Plan of NUSCO offered the highest value available at the conclusion of the well-publicized auction, which had inter-

ested four substantial regional utility companies. *Id.*, 227–30.

\* \* \* \* \* \*

Appellants misplace reliance on what they perceive to be an "etched-in-stone" rate-making analysis grounded on a rate base which includes only property "used and useful" in the generation of electricity in which the utility's investment was "prudent" at the time made. *Appeal of Conservation Law Foundation*, 127 N.H. 606, 637–38, 507 A.2d 652, 673–74 (1986). Not only may legislators give specific instructions to their utility commissions, *Dequesne Light Co. v. Barasch*, 488 U.S. 299, 313 [109 S.Ct. 609, 618, 102 L.Ed.2d 646] (1989), but the prudent investment rule is not a constitutional standard. *Id.* at 315 [109 S.Ct. at 619].

While the appeal from the confirmation order was pending in the federal courts the RKR individual stockholders appeared in the NHPUC hearings dealing with the approval of the rate agreement provided for under the confirmed plan of reorganization.[9]

While the RKR group was ultimately denied standing with regard to the NHPUC rate proceedings, and its appeal to the New Hampshire Supreme Court was ultimately dismissed, the New Hampshire Supreme Court in dealing with various appeals from the NHPUC approval order discussed in some detail contentions as to New Hampshire ratemaking requirements, and constitutional requirements, similar to those put forward by the RKR group both in the bankruptcy proceedings and the NHPUC proceedings. Particularly relevant portions of that discussion for present purposes appear in the decision reported in *Appeal of Robert C. Richards, Edward Kaufman, and Martin Rochman* and *Appeal of Campaign For Ratepayers Rights And John V. Hilberg*, (New Hampshire Public Utilities Commission) 134 N.H. 148, 143, 148, 164, 590 A.2d 586 (1991), as follows:

---

**9.** Section 1129(a)(6) of the Bankruptcy Code requires approval of any such rate agreements

included in the plan of reorganization of a regulated utility company.

The PUC approved the rate plan in an order issued on July 20, 1990. *See id.* at 469–70. The order was accompanied by an extensive written decision, in which the PUC explained its analysis of the average base retail rate increases contained in the rate plan and summarized the evidence supporting its findings. It concluded that "the implementation of the Rate Plan as set forth herein is consistent with the public good ... and will result in just and reasonable rates that equitably balance the interests of ratepayers and investors." *Id.* at 460.

The PUC reached its decision after comparing the rate of return to the cost of capital under the rate plan. *Id.* at 405–08. It also compared the rates under the rate plan with rates forecast for other New England utilities, *id.* at 411–12, and the rates estimated, insofar as foreseeable, under traditional ratemaking principles, *id.* at 410–11. The PUC stated that the rates resulting from the use of traditional ratemaking methodology would probably be higher than those provided for by the rate plan, but that it was not required to calculate the precise level of rates under traditional ratemaking principles "to determine whether the Rate Plan serves the public good with just and reasonable rates over the fixed rate period." *Id.* at 410. Moreover, it asserted that "[d]etermination of just and reasonable rates by traditional ratemaking methodology, is precluded by the Rate [Plan's] prescribing the level of retail rates over the seven year fixed rate period." *Id.* at 408. The PUC nonetheless estimated the rates that would be achieved under traditional ratemaking principles, insofar as foreseeability permitted. *See id.* at 410. *Appeal of Robert C. Richards, Edward Kaufman and Martin Rochman,* 134 N.H., 148, 143 [590 A.2d 586].

\* \* \* \* \* \*

Based upon the foregoing analysis, we hold that RSA 362–C:3 (Supp.1990) did not require the PUC to analyze the rate plan in accordance with traditional ratemaking principles. By using the phrase "just and reasonable," the legislature referred to the constitutional "just and reasonable" standard, rather than the "just and reasonable" standard found in traditional ratemaking statutes, applicable to traditional ratemaking procedures, and discussed in *Appeal of Conservation Law Foundation.*

Hillberg and CRR also appear to argue that the PUC was constitutionally required to apply traditional ratemaking analysis. Again, they cite *Appeal of Conservation Law Foundation* as authority. In *Appeal of Conservation Law Foundation,* we noted that "any attempt to judge reasonableness [of rates] apart from [the traditional ratemaking] process would ... risk ... unconstitutionality." 127 N.H. at 639, 507 A.2d at 674. We did not, however, foreclose the possibility that there existed other constitutionally permissible means of determining "just and reasonable" rates, nor should our holding in that case be construed as unconditionally requiring the use of that traditional ratemaking methodology.

A holding that the use of that traditional ratemaking formula is constitutionally required would be contrary to well-established federal constitutional case law. In *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591 [64 S.Ct. 281, 88 L.Ed. 333] (1944), the seminal case in this area, the United States Supreme Court held that the Federal Natural Gas Act, 15 U.S.C. § 717 (1988), does not require the use of any particular formula in determining rates. *Id.* at 602 [64 S.Ct. at 287]. The Court stated that the methodology used to set rates is irrelevant. *See id.* Instead, it is the result reached that is important: "[i]f the total effect of the rate order cannot be said to be unjust or unreasonable, judicial injury ... is at an end." *Id.* Although the Court decided the case under the Federal Natural Gas Act, it noted that "there are no constitutional requirements more exacting than the standards of the Act." *Id.* at 607 [64 S.Ct. at 290].

## VI. SPECIFIC PRECLUSION

 The doctrine of *res judicata* precludes parties or their privies from relit-

igating issues that were *or could have been raised* in the pertinent court proceeding. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); *Manego v. Orleans Board of Trade,* 773 F.2d 1, 5 (1st Cir.1985). Moreover, a judgment dismissing an action as being time-barred is considered for the *res judicata* purposes to be a final judgment on the merits. *Kale v. Combined Insurance Company of America,* 924 F.2d 1161, 1164 (1st Cir.1991). Finally, the Court of Appeals for this Circuit has adopted the "transactional test" for *res judicata* purposes holding that a final judgment against a party cuts off all rights of that party to remedies against the other party with regard to all or any part of the transaction, or series of connected transactions, out of which the action arose. *Manego v. Orleans Board of Trade,* 773 F.2d at 5; *In re Surrette Storage Battery Co.,* 109 B.R. 544 (Bankr.N.H.1989).

■ Applying these principals to the present case, the Court finds and concludes that the RKR stockholders did raise, or had the opportunity to raise, during the course of the disclosure statement and plan confirmation hearings in this case, all of the contentions that they now threaten to pursue in the proposed litigation.[10] With regard to the adequacy and appropriateness of the disclosure as to New Hampshire

ratemaking procedures and requirements they certainly had ample opportunity to make their contentions known but suffered an adverse determination to those contentions in both the order approving the disclosure statement and the order confirming the plan with its specific determinations as to compliance with the provisions of the Bankruptcy Code including § 1125 of that Code.

With regard to the contentions concerning the lack of good faith in the solicitation of votes by the plan proponents those contentions were made, or could have been made in more detail, during the same proceedings and again were determined adversely to the RKR stockholders.

With regard to the specific RKR contention that the disclosure statement misrepresented the value of the merger to the ratepayers of PSNH, and the stockholders and ratepayers of NU, again the question of values under the reorganization of plan was in fact a focal point of both the disclosure statement and plan confirmation hearings.[11] The fact that the disclosure did not contain the degree of detail that RKR now argues was appropriate has been determined adversely to them by the Court's findings with regard to the disclosure statement and confirmed plan that are now final.

**10.** The confirmation order (docket 3617) incorporates by reference the general findings (docket 3618) which in turn in paragraph 47 finds that the plan solicitation was in good faith and complied with § 1125. That finding notes that the court revisited this issue at the outset of the confirmation hearings, upon renewed objection to the disclosure statement by the RKR group, and again determined that the statement provided adequate disclosure. See Transcript Vol. I (docket 3625) of April 4, 1990 hearing, pp. 65–67, 106–113.

**11.** The plan of reorganization itself, a copy of which was attached to the disclosure statement, has the rate agreement attached as Exhibit D to the plan, and sets forth in pages D–85 through D–90, a detailed discussion of the "Investement Adder" defined as "the capitalized synergies, efficiencies or other cost savings or benefits brought by NU to the acquisition of PSNH ..." This segment then discusses in some further detail the various calculations and formula pertinent to the Investment Adder to be considered

in the further hearings before the NHPUC. Likewise, a definition and discussion of the "acquisition premium" feature of the rate agreement appears in pages D–5, D–6, and D–14 of Exhibit D. For a discussion of the unique nature of these "regulatory assets" and the justification for their employment in this unique situation (a subject also much bruited about in the plan formulation stage of the PSNH case) see *Re Northeast Utilities/Public Service Company of New Hampshire,* 114 PUR 4th 385, 414–17, 432–38 (N.H.P.U.C.1990). If the RKR group were not precluded from raising the issue, as noted below, I would be constrained to force them to take a good long look at the "carcass of a dead elephant" (the grossly excess-cost nuclear power plan involved) that I have brought before other litigants on occasion in this and other utility cases stemming from the Seabrook plant. See *In re New Hampshire Electric Cooperative,* 138 B.R. 668, 676, fn. 3 (Bankr.D.N.H.1992). It simply does not do to talk about values and rates in this case in theoretical terms that ignore that harsh reality.

In any event, I do not accept the RKR contentions in this context that the alleged value "misrepresentations" by the plan proponents were not a general topic of discussion during the hearings and could not have been asserted in more detail during the plan disclosure and confirmation proceedings. In my judgment the RKR stockholders were obligated to do the necessary analysis and raise those contentions during the proceedings leading up to the plan confirmation or be bound by the Court's now final determinations with regard to the disclosure statement and confirmation of the plan.

The fact that they may not have "thought" of that analysis in the specific form now presented until they were prompted to do so by statements made in other proceedings, subsequent to the confirmation, does not in my view justify their failure to raise those contentions in more detail during the course of the reorganization proceedings prior to entry of the confirmation order if they deemed them material.

In short, I find and conclude that the defendants in the present adversary proceeding are precluded from taking a position contrary to the now final determination by this Court that the disclosure statement approved in this case included adequate information for those voting on the plan to consider their choices; the determination that the plan proponents complied with all applicable provisions of the Bankruptcy Code in seeking the confirmation of the plan; and the determination that the plan was proposed in good faith and that the votes of acceptance were solicited in good faith by the plan proponents. I further find and conclude that this preclusive effect extends to not only the specific issues raised by the RKR stockholders during the reorganization proceedings, but also to other related issues that could have been raised in the same context, and that this preclusive effect includes the asser-

tions set forth in the proposed complaint and litigation that is threatened against the plaintiffs.[12]

## VII. EFFECT OF § 1125(e)

The RKR stockholders argue that, inasmuch as § 1125(e) of the Code (the "safe harbor" provision) insulates plan proponents from lawsuits regarding their solicitation of acceptance of their plan only if they act in that regard "in good faith and in compliance with the applicable provisions" of the Code, the statute necessarily implies that such plan proponents can be sued outside the reorganization court subsequent to confirmation of the plan notwithstanding that confirmation. There is very little case law under § 1125(e), notwithstanding its inclusion in the original Bankruptcy Reform Act of 1978, and there are *no* case decisions supporting or refuting the contentions made by the RKR stockholders on this point.

It is true that the Court in *Yell Forestry Products v. First State Bank of Plainview*, 853 F.2d 582, 584 (8th Cir.1988), stated in dicta that a finding of good faith in a confirmation order would not always protect a proponent of a plan from charges of fraud but the actual decision in that case was to grant summary judgment against the party suing the plan proponents in view of the findings by the bankruptcy court with regard to adequate disclosure and the good faith of the plan proponents.

It may be said as a matter of logic and statutory interpretation that if Congress intended that the approval of a disclosure statement and the confirmation of a plan of reorganization with a good faith finding would insulate plan proponents from any subsequent litigation the statute could have simply so provided directly. The necessary implication is that Congress may have intended to leave open some areas for post-confirmation litigation notwithstanding the confirmation of the plan.[13]

---

**12.** The RKR stockholders did of course have a post-confirmation remedy for fraud in the procurement of the confirmation order under § 1144 of the Bankruptcy Code but, as indicated above, their motion in that regard was denied as untimely under the mandatory 180 day statute of limitations therein involved.

**13.** It is curious however that Congress also enacted § 1144 which expressly provides a remedy for fraud discovered post-confirmation, albeit

On the other hand, it does not seem rational to permit full litigation of alleged inadequacies and misrepresentations in disclosure during the course of extensive disclosure statement hearings, leading to a contested and fully-litigated confirmation hearing resulting in success for the plan proponents with findings of compliance with the Bankruptcy Code and good faith on the part of the plan proponents, and still let the defeated litigants blithely "start all over again" asserting the same basic contentions in post-confirmation litigation against the plan proponents outside the bankruptcy court forum.

■ It may be that these somewhat conflicting statutory provisions can be harmonized by a rule to the effect that a finding of good faith in a plan confirmation order, accompanied by the earlier determination that the disclosure statement contained adequate information, will not be binding upon parties to the reorganization who can allege and establish a true "secret fraud" with regard to a topic that was not addressed, and normally would *not* be addressed, during the course of the reorganization proceedings. A secret fraud in this sense would involve a fact or topic which was not the subject of discussion and consideration during the reorganization proceedings, and therefore a matter as to which the Court was not called upon to consider as to the breadth and detail of disclosure necessary, but which covered a fact or topic whose very existence was unknown and not within the normal scope of disclosure expectable in the circumstances. For an example of such a fact pattern see *In re Michelson*, 141 B.R. 715 (Bankr.E.D.Cal.1992) (confirmation revoked under § 1144). In such circumstances the reorganization court obviously could not make an informed judgment as to the appropriateness of disclosing the "unexpected" fact in question and therefore arguably its adequate disclosure and good faith determination should not be binding for § 1125(e) purposes.

In the present case, however, it is unnecessary for this Court to reach the question

posited above as to possible cases in which the disclosure statement and plan confirmation determinations should not be binding upon litigants who took active part in litigation pertinent to those determinations, and did not prevail, but who nevertheless wish to pursue securities fraud litigation thereafter. In the present case the RKR stockholders had full and ample opportunity to assert the contentions now threatened for post-confirmation litigation and accordingly the Court can and does rule that on these facts the plaintiffs are insulated from the threatened litigation by the provisions of § 1125(e) and the preclusive effects of the relevant orders entered in the reorganization proceedings.

With regard to the intervenor State of New Hampshire the Court finds and concludes that in addition to the Eleventh Amendment bar to suit against the State the intervenor is also entitled to the *res judicata* effect of the determinations made during the course of the reorganization proceedings, although the State as a non-plan proponent is not itself entitled to the "safe harbor" provisions of § 1125(e) of the Code.

## VIII. CONCLUSION

In accordance with the foregoing findings and conclusions the Court concludes that the motions for summary judgment by the plaintiffs and the intervenor should be granted and the motion for summary judgment by the defendant should be denied, in a declaratory judgment consistent with the findings and reasoning set forth in this opinion.

With regard to the granting of injunctive relief to prohibit the threatened litigation, the Court concludes that injunctive relief is warranted on the facts of this case to effectuate the policies of finality underlying reorganization proceedings under chapter 11 of the Bankruptcy Code. The particular determinations made by this Court after extensive litigation with regard to the disclosure statement and the plan confirmation should not be permitted to be reopened for yet another round of assertion of the

with a rigid 180 day statute of limitations applicable to that remedy.

same essential complaints against the plan proponents. To permit post-confirmation further litigation against the plan proponents on these facts in my judgment would have a chilling effect upon participation by attorneys, financial advisors, and committee members essential to successful reorganization proceedings under chapter 11 of the Bankruptcy Code. On that ground, I conclude that not only declaratory relief but injunctive relief as requested should be granted.

The plaintiffs shall submit a form of judgment in accordance with this opinion within ten days of date. No appeal time shall run until said final judgment is entered.